**BON AIR HOTEL, INC., Plaintiff,**

v.

**TIME, INC., and Dan Jenkins, Defendants.**

**Civ. A. No. 1171.**

United States District Court
S. D. Georgia,
Augusta Division.

Jan. 28, 1969.

Cumming, Nixon, Eve, Waller & Capers, Augusta, Ga., for plaintiff.

Fulcher, Fulcher, Hagler, Harper & Reed, Augusta, Ga., Harold R. Medina, Jr., Cravath, Swaine & Moore, New York City, for defendants.

## ORDER

LAWRENCE, District Judge.

On December 20, 1967, Judge Scarlett overruled the Motion for Summary Judgment by defendants addressed to the First Amendment issue as related to the article concerning the Bon Air Hotel and the Masters Tournament in the April 6, 1964 issue of SPORTS ILLUSTRATED. He sanctioned an interlocutory appeal under 28 § 1292(b), which was taken. The Court of Appeals declined to allow the appeal. Subsequently the Supreme

Court denied certiorari. 393 U.S. 859, 89 S.Ct. 131, 21 L.Ed.2d 127.[1]

At an informal pretrial conference on November 4th last counsel for defendants announced their intent to press the constitutional issue at the trial in the face of the refusal of the Court of Appeals and the Supreme Court to entertain an interlocutory review. Subsequently, in a memorandum furnished me counsel stated: "Despite the doubts expressed at the preliminary pretrial conference as to the power of this Court again to consider the constitutional issues in this case, additional research has convinced us that the denial by Judge Scarlett of defendants' Motion for Summary Judgment is not law of the case as to the constitutional issues raised on that motion and defendants may again raise those issues at trial."

Believing that a bolder approach might be in order, I wrote to counsel on January 20th inquiring as to the power of a District Judge under Rule 60(b) to review at this stage the prior decision of Judge Scarlett and whether if authority to vacate and reverse exists the power is properly exercisable under all the circumstances.

The decision in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, which was handed down a month before the article about the Bon Air came out in SPORTS ILLUSTRATED placed plaintiff's case upon somewhat shaky ground at the start. The Court held that no damages are recoverable by a public official for defamatory falsehood relating to his official conduct unless actual malice is proven. While the action involved libel of public officials there was a prophetic monition in a foot-note that no need existed "here to determine the boundaries of the 'official conduct' concept."

Whatever solid ground plaintiff's case originally stood on has been steadily eroded by the sweep and flow of First Amendment freedoms through new and wider channels. To summarize the year-by-year developments in constitutional interpretation in this area:

1966—Linn v. United Plant Guard Workers, 383 U.S. 53, 86 S.Ct. 657, 15 L. Ed.2d 582

Here the Supreme Court, using *New York Times* as an analogy in construing Sections 7 and 8 of the National Labor Relations Act, held that an official of an employer who brought a libel action against a union could recover for defamatory statements made by defendant during a labor dispute only when they were published with knowledge of or with reckless disregard of their falsity.

1966—Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597

Here the ruling in New York Times v. Sullivan was extended to defamation by a newspaper in connection with the performance of public duties by a former supervisor of a county recreation area.

1967—Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456

In a suit for an invasion of privacy against LIFE magazine in violation of a state statute the Supreme Court applied the rule of *New York Times* to false reporting of "matters of public interest"

---

1. Justice Black who was joined by Justice Douglas said in dissenting, "I would grant certiorari in this case and hold that the petitioners, Time, Inc., and Dan Jenkins, were entitled to summary judgment since, for the reasons stated in the concurring opinions of Mr. Justice Douglas and myself in New York Times Co. v. Sullivan, 376 U.S. 254, 293, 84 S.Ct. 710, 11 L.Ed.2d 686; Rosenblatt v. Baer, 383 U.S. 75, 94, 86 S.Ct. 669, 15 L.Ed.2d 597, and Curtis Publishing Co. v. Butts, 388 U.S. 130, 170, 87 S.Ct. 1975, 18 L.Ed. 2d 1094. I believe that a libel judgment against these petitioners is forbidden by the First Amendment's guarantee that freedom of the press shall not be abridged, a guarantee made applicable to States by the Fourteenth Amendment. This constitutional bar would apply to any state of facts that might be shown at the trial of this case. I believe the First Amendment was intended to leave the press free from the harassment and expense of suits such as this."

and denied any recovery in the absence of proof of actual malice.

1967—Curtis Publishing Co. v. Butts; Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094

In these two cases the Court extended *New York Times* by the inclusion in its concept of "public figures." A recovery was denied in *Walker*. The verdict for Butts was permitted to stand by a closely divided court. The Chief Justice concurred in the result in that case but not in the deviation from the actual malice rule suggested by four Justices who would have a recovery in libel limited to instances of extreme departure from standards of investigating and reporting ordinarily adhered to by responsible publishers. Butts was held to be a public figure and Walker was classified as one by reason of his thrusting his personality into an area of "important public controversy."

1967—Beckley Newspaper Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248.

The Court held here that editorials criticizing the official conduct of a clerk of court fell short of showing that the failure of the newspaper to make a prior investigation as to the truth of the statements presented a jury question with respect to reckless disregard for the truth.

1968—St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262.

The Supreme Court ruled in this case that there could be no recovery of damages for televised defamatory statements made by a candidate for public office concerning a sheriff in the absence of proof of actual malice.

1968—United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 404 F.2d 706, 9th Cir., November 18, 1968

This case involved televised and radio broadcasts and press releases by Columbia concerning inaccuracies of tests of clinical specimens by mail order testing laboratories. In affirming (on a different and federal ground) the decision of the District Court granting a summary judgment to defendant the Court of Appeals for the Ninth Circuit said:

"It is, of course, not possible to say just how far the Court will continue to carry such extensions. But unless all other areas, not merely those of legitimate general interest but also those of affecting personal concern to the public, are to be artificially ignored, we are not able to see how the path upon which the Court has been moving can be regarded as having reached an end."

1969—Time, Inc. v. McLaney, 406 F.2d 565, 5th Cir.

Here the District Judge overruled defendant's Motion for Summary Judgment but certified cause for interlocutory appeal. Where a year before the Court of Appeals for this Circuit had declined to allow an appeal in the Bon Air case it granted the application in *McLaney*. In this case the authors after an investigation of certain rumors and leads wrote an article published in LIFE magazine under the title of "The Scandal in the Bahamas." The piece dealt with the migration from Cuba of professional gamblers, including McLaney who had managed one of Havana's big casinoes. In the January, 1967 election in the Bahamas he supported one of the political parties and provided free airlifts for its candidates. "The mob", the article said, "always tried to hedge its bets."

After close examination and analysis of the evidence before it on the Motion for Summary Judgment the Court of Appeals concluded:

"* * * the constitutional privilege extends to discussions by specific individuals, not associated with any government, if those individuals are involved in matters of important public concern. Such was the case of the plaintiff here. He had injected himself into an election campaign in a small foreign country in which the announced policy of the opposition to the present government was the elimination of racketeer gambling. He had

supported the effort of this reform government by contributing substantial material aid, and thus lent a direct influence to the election of a national government for the country. Such activities as he engaged in, and his conduct as such a participant, are the proper subject of inquiry and of public interest."

In the light of the progression of *New York Times* I certainly do not want to listen for a week or so to evidence as to whether the exterior of the Bon Air Hotel had a "whitewashed face" in 1964; whether there was ample room for guests to walk between a dresser and bed; whether the windows were usually jammed; whether the hotel was noisy at night; whether guests of the hotel registered at their own risk; whether nocturnal users of fire escapes wore high heels; whether the white-coated waiters were ancient and drowsy, and so on—as I say, I do not relish going through an extended trial of this libel suit and then have the Court of Appeals instruct me (if plaintiff prevails) that defendant's Motion for Summary Judgment should have been sustained on the First Amendment issue because of lack of actual malice.

Does the element of public interest exist here? The focus of the article was the decline into dishevelment of the Bon Air Hotel though the general theme was Augusta and the Masters Tournament. According to the author, 100,000 golf enthusiasts visit that city each year when it is played. Millions watch the event on television. For over twenty years prior to 1960 the Bon Air had been a landmark of the Masters scene. It was part and parcel of the Tournament. As the article says, "The Bon Air was the place to be, and to be seen." During the period 1961–1964 the hotel was closed for fifty-one weeks of each year and was opened only for the week of the Masters. The author had stayed at or visited the Bon Air for thirteen years and had observed first hand its alleged decline from the status of *grande dame* into the station of a dowdy, decrepit and disheveled old

woman. Jenkins was requested by the Editor of the magazine to write an article about the "surroundings" in which the tournament is held. In preparing the piece he decided that readers would be interested in a story concerning the accommodations at Augusta available to players and spectators. The fact that the April 6, 1964 issue of SPORTS ILLUSTRATED was largely devoted to the Masters Tournament indicates the high degree of interest in the event.

In *Columbia Broadcasting Company* the Ninth Circuit found "public interest", justifying First Amendment protection, in inaccurate testings of clinical specimens by mail order laboratories. In *McLaney* this Circuit discovered such an interest and "a proper subject of inquiry" in an election in a small foreign country. It also found that one engaged in the gambling business who supported the winning political party in the election was a "public figure."

▇ Hotels are public accommodations. The business of running them is of a public or quasi-public character. 43 C.J.S. Innkeepers § 8. By opening its doors to travelers an innkeeper invites both guests and criticism of the inn. The sort of public accommodations a visitor can expect at Augusta during Masters week seems to me to be a matter of considerable interest to those of the golfing public who contemplate attending the Tournament.

Among the subjects dealt with in the Jenkins article was the high cost of public and private accommodations during the week of the Tournament. For example, there was the year play was rained out and Gary Player had to stay over for another day. He discovered, according to the author, that "the extra day's rent can sound like a good share of the purse money." The article stated that an Atlanta sports writer informed Jenkins, "The Bon Air has always been closed. They've only charged money to stay there during the tournament." The Augusta newspaper correspondent who checked the statements for SPORTS

ILLUSTRATED reported to it that the Chamber of Commerce had tried to get the Hotel to reduce room prices but were told that theirs were "not the highest in town."

■■■ In my opinion, in bringing to light the exorbitant prices charged for accommodations during the Tournament the article possessed a valid public interest in its subject-matter which, apart from any other consideration, brings defendants within the constitutionally protected area of free expression. First Amendment immunity in such cases applies no matter how "uninhibited, robust * * * wide open * * * vehement, caustic, and * * * unpleasantly sharp" the comments were about the Bon Air. See 376 U.S. 270, 84 S.Ct. 721.

Having reached the conclusion that this is a proper case for application of the immunity rule of *New York Times* it becomes relevant to consider the First Amendment phase of Judge Scarlett's order overruling defendants' Motion for Summary Judgment. Apparently hard put to get around *Butts* and *Walker,* he was able to find a controlling distinction between defamation there and defamation here. Judge Scarlett concluded that the Hotel was not a "public figure" since it did not command sufficient continuing public interest and sufficient means of "counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." See in this connection 388 U.S. 135, 87 S.Ct. 1975. Adequacy of means of self-defense and ability to counter false charges is not a decisive criterion by which a defamer's right to First Amendment protection is to be judged. In seeking to bring libel actions to terms with the First Amendment in the extension of the "public official" concept to "public figures" Justice Harlan perceived an analogy in a principle of tort law referred to in Brewer v. Hearst Publishing Co., 185 F.2d 846 (7 Cir.) and other cases. The existence of means to counter defamation is at best only a factor and not a conclusive one in ascertaining whether a "pub-

lic figure" is involved. Further, I have used the public interest rather than public figure approach in dealing with the issue in this case.

It is entirely possible that Judge Scarlett was correct in 1967 and wrong in 1969. This field of constitutional law is fast changing, rapidly developing and his order overruling the Motion may have become erroneous in the light of developments which make the actual malice test applicable here.

There is a wide dichotomy of viewpoint in the lower Courts as to the extension of *New York Times* into the field into which I have ventured. In a comprehensive discussion of the extension of the "Actual Malice Standard to Defamation of Public Figures" (Georgia Law Review, Vol. 2 (Spring, 1968), 393–432) the author says (p. 408):

"In denying a broad application of *Sullivan,* courts have contended that a comprehensive application would constitute an unwarranted infringement upon the right of the individual to protect his reputation. With this consideration in mind, courts have refused to apply the *Sullivan* rule to a pharmacist, a lobbyist in Congress, a football coach at a state university, a radio and television personality a comedian, a socialite, a confessed conspirator to the assassination of the famed Russian Rasputin, a former heavyweight boxing champion, and a major league baseball pitcher."

On the other hand, according to the author of the article in the Georgia Law Review (p. 409):

"Other courts, however, have recognized that public policy demands maximum freedom of debate on public issues and thus have expanded the rationale of *Sullivan* well beyond the limits of elected or appointed government employees. These decisions have applied the *Sullivan* doctrine to public discussion concerning a noted scientist and Nobel Prize winner, a retired Army General, a British corporation, a student senator in a university sen-

ate, a mayor's law partner, and a noted newspaper columnist."

The extension of First Amendment protection to the defendants in the present case is a step "no more venturesome than the extension which had been made of *New York Times* to public figures by the cases of Pauling v. News Syndicate Co., 335 F.2d 659 (2 Cir. 1964) and Pauling v. Globe Democrat Publishing Company, 362 F.2d 188 (8 Cir. 1966), before the decisions in *Butts* and *Walker* had been rendered." See United Medical Laboratories v. Columbia Broadcasting System, supra.

In Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (where there was a refusal to extend *New York Times* to a pharmacist) the Court said (p. 658): "We conclude that *New York Times*, as written and likely to be extended, does not and will not preclude recovery, even in the absence of malice, * * * by a man who has not mounted a public rostrum, made an appeal to the public, sought or received public funds, *offered a service* or product *for public use* or comment * * *" (Italics supplied).

In distinguishing the Bon Air Hotel from *McLaney* and other cases plaintiff argues that "For the 'public figure' privilege to apply not only must the matter covered in the publication be of substantial public interest, but the plaintiff must be considered a public figure. The Bon Air—an inconspicuous and little known one-time winter hotel—was neither. The brief period of the Masters Tournament, however famous with golf buffs—an infinitesimal percentage of the public—does not make it one."

I disagree, believing that the size of the public accommodation and the small percentage of the public aware of its existence is not controlling. In the setting of the article about Augusta and the Masters there was legitimate and substantial public interest, I think, in the Bon Air Hotel which entitles defendants to immunity from liability for defamation, absent actual malice. In my opinion, the previous ruling in this case, whether correct or incorrect when entered, is *now* erroneous. If I am wrong about this, no harm will have been done as the case will then be tried in the light instead of the dark.

Assuming falsity of the charges, does the record show actual malice?

The Motion for Summary Judgment is based on the affidavit of the defendant Jenkins and that of a reporter-researcher on SPORTS ILLUSTRATED and upon certain exhibits filed with them. It was not countered by Bon Air except for an affidavit by the President which repeated the allegations as to falsity of certain statements in the article entitled "AUGUSTA Where Georgia Retaliates for Sherman's March."

█ As so presented, the record is devoid of any showing that defamatory statements were published by defendant Time, Inc. with knowledge of their falsity or with a reckless disregard of whether they were true or false. Nor does it "permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, supra, 390 U.S. 731, 88 S.Ct. 1325. Further, plaintiff's evidence fails to measure up to the test urged by Justice Harlan and three other Justices in *Butts* as to extreme departure from the ordinary standards of responsible publishers.

The author of the article, Dan Jenkins, graduated from a Texas college in 1953. Subsequently he became a sports editor at Dallas and Fort Worth. In 1963 he joined the staff of SPORTS ILLUSTRATED. Jenkins is the author of a book on golf and was the ghost biographer of Mark McCormack's *Arnie*.[2]

---

2. In the same issue of SPORTS ILLUSTRATED in which the Jenkins article peared McCormack wrote a piece in which he referred to his business representation of Palmer, Nicklaus and Player. Their interests and holdings had become so extensive that in a little over a year he had travelled on their behalf to Europe 5 times, Hawaii 4 times, South Africa, Australia and to the West Coast 12 times.

In preparing the article about the Masters he drew both on his own experiences at Augusta and from interviews with many people, including participants in the Tournament and their wives, sports writers and editors. A draft of the proposed article was submitted a month before publication. The publisher directed a research assistant, Miss Sarah Pileggi, to check the manuscript for factual accuracy. In addition to personal calls she sent a "Query Sheet", containing questions, to Jim Minter, a reporter on the Atlanta *Journal*. The latter answered some of the inquiries and for verification referred the others to a competent Augusta newspaperwoman who was correspondent of the *Journal* in that city.[3]

Upon the completion of her fact-checking, Miss Pileggi handed the article back to the author, believing, she states in her affidavit, that every statement she checked was true. To illustrate her efforts to verify factual statements I will mention three or four examples taken from the exhibits.

In the article it was said that "The halls still sloped awkwardly toward rooms numbered in such fascinating sequences as 352, 353, 362. Most of the rooms at the Bon Air are wide enough so that by turning sideways a guest can walk between the bed and the dresser." Mr. Minter was specifically asked to verify the statement as to sloping halls and "tiny bedrooms." He wired SPORTS ILLUSTRATED that "References to Bon Air condition a year ago are generally correct."[4]

Exception is taken to the statement that "The tub and the basin were never worth much." In checking this assertion

Minter informed SPORTS ILLUSTRATED that the hotel manager said that plumbing and bathrooms had been repaired. The Augusta newspaperwoman advised the magazine that "Many of the damaged plumbing fixtures have been repaired." As a result of this information Jenkins added the parenthetical sentence, "The new Texas ownership reputedly has done some work on the plumbing."

The affidavit furnished by the President of the Bon Air Hotel in connection with the Motion for Summary Judgment states that the claim that the Hotel had a "whitewashed face" was and is "entirely untrue, in that the exterior of the Bon Air Hotel during the latter part of 1963 and the early part of 1964 were painted white." The Query Sheet sent to Minter asked, "Does it have a whitewashed exterior? If not, what color?" The Augusta correspondent informed the publisher in March, 1964 that the hotel was "now being painted outside white"—"a dazzling white," as she subsequently reported. Minter advised SPORTS ILLUSTRATED that the color of the stucco was "white yellowish." In using the phrase "whitewashed face" I think the author was probably speaking figuratively rather than factually. In any event, there is no need to make a federal case out of the difference between whitewashing a building with a composition of lime, size, water, and whitening and painting the exterior with a mixture of pigment, linseed oil, and white lead.

Lest the foregoing observations take on the appearance of a judicial "whitewash" of the article, I will add that the investigation seemingly did not verify some of the charges about "the quaint

---

He said, " * * * I am now convinced, this was almost all because of that one grand tournament that is held each year in Augusta, Ga."

3. In one of two telegrams to SPORTS IL-LUSTRATED, Mr. Minter said, "I assume questions of libel might be involved. With this in mind I have asked [the Augusta correspondent] to check some

of the facts I could not be absolutely certain about."

4. It must be remembered that Jenkins was not describing the state of the hotel in 1964. For example, he prefaced an account of certain conditions of decrepitude with the remark, "Take last year." His article generally dealt with the decline of the hotel during the 1950's and the way it was in 1963.

old" Hotel. Take the statement that "Bon Air maids are where you find them, and they usually respond to any plea by locking the guest in his room"—a broad assertion apparently authenticated by the single experience of Jim Turnesa.[5]

But this is beside the point. The thing is that all of this is within the realm of constitutionally-protected utterance.

 Plaintiff concedes that this Court possesses the power to vacate Judge Scarlett's order. Prior to the adoption of the Rules of Civil Procedure federal courts could not set aside or alter a final judgment after the expiration of the term at which it was entered. 7 Moore's Federal Practice (2d), § 60.09. This was changed by Rule 6(c). Gilmore v. United States, 131 F.2d 873 (8 Cir.). The power especially exists where, as here, the order is interlocutory. Carter v. American Bus Lines, 22 F.R.D. 323 (D.C.); Kliaguine v. Jerome, 91 F.Supp. 809 (D.C.); John Simmons Co. v. Grier Bros. Co., 258 U.S. 82 at 88, 42 S.Ct. 196, 66 L.Ed. 475. In such cases the power to vacate is within a court's sound discretion. Assmann v. Fleming, 159 F.2d 332 (8 Cir.). A judge has a wide range of judicial discretion, for under Rule 60 he may vacate an order "wherever such action is appropriate to accomplish justice." Klapprott v. United States, 335 U.S. 601, 69 S.Ct. 384, 93 L.Ed. 266; Patapoff v. Vollstedt's, Inc., 267 F.2d 863 (9 Cir.). I deem such action appropriate here.

Relief under 60(b) is generally grantable only upon motion and not on the court's own initiative. Dow v. Baird, 389 F.2d 882 (10 Cir.). In the defendants' response to my communication to counsel on January 20, 1969 concerning the power to vacate under 60(b) they suggest that their letter be treated as such a motion for reconsideration. I have done so.

In the light of the foregoing, the order entered by Judge Scarlett on December 20, 1967 is vacated. The present opinion and order is substituted. Defendants' Motion for Summary Judgment is granted and the action is dismissed.

---

5. "Though the boys throw stones at frogs in sport, yet the frogs do not die in sport but in earnest." (Plutarch quoted in Sports Illustrated, letters to the editor, Fall of 1968. Actually it was Bion who said it). " * * * the deadly *Bufo marinus* toad [has] infiltrated Florida, killing or grievously sickening those dogs rash enough to bite into its poison-laden neck." (Sports Illustrated, Jan. 13, 1969, p. 9). If verbal stones *must* be thrown, I suggest they be aimed at the *Bufo marinus* species.