**Harold KONIGSBERG, Plaintiff,**

v.

**TIME, INC., Defendant.**

**No. 68 Civ. 4112.**

United States District Court,
S. D. New York.

May 8, 1970.

OPINION

POLLACK, District Judge.

"The Congressman and the Hoodlum," a Life Magazine article dealing with organized crime, was published on August 9, 1968, by Time, Inc. The article primarily concerns New Jersey Congressman Cornelius E. Gallagher's involvement with the Mafia. In the course of the article, reference is made to Harold K. (Kayo) Konigsberg who, at the behest of a "capo in Cosa Nostra" (Article at 20), is supposed to have disposed of a body which was in the basement of Gallagher's home.

Konigsberg is now suing Time, Inc. for libel, claiming that the story that he disposed of a body, that of the missing Barney O'Brien, is not only untrue, but also malicious, vicious, and defamatory. Konigsberg complains that the article portrays him as "the most dangerous uncaged killer on the east coast" (Article at 25), quoting a federal official who said, " 'Kayo was an animal on a leash for Zicarelli [the Cosa Nostra "capo"] and others * * * he'd kill for the fun of it' ". (Article at 25) The Life article goes on to say: "Konigsberg shot some of his victims, throttled others with his bare hands. As a loan shark, he took over the deadbeat loans of other shylocks and joyfully went about squeezing cash from the borrowers, sometimes by beating them with ball bats and chairs". (Article at 25–26) Konigsberg argues that all such statements are untrue, false, malicious, vicious, pure fiction and defamatory.

Konigsberg says that equally untrue and malicious were statements that he "sought to cooperate with Justice Department and other law enforcement officials, that he had interred many murder victims, that he talked or offered to talk about a gang cemetery, and led officials to a mash pit and graves of murder victims". (Complaint at 3)

Also complained of is the publication of a photograph of Konigsberg which is alleged to be a "distorted and unfair picture * * * taken many years

Nathan Kestnbaum, New York City, for plaintiff.

Cravath, Swaine & Moore, by Harold R. Medina, Jr., New York City, for defendant.

before, and part and parcel of [Life's] plan and scheme to defame plaintiff and hold him up to public ridicule and scorn". (Complaint at 3)

Konigsberg seeks Five Million Dollars in compensatory and punitive damages.

Defendant has moved for summary judgment, dismissing the complaint on the merits, on the ground that there is no genuine issue as to any material fact and that as a matter of law, Time, Inc. is entitled to judgment now.

■ Before it can be determined that no issue of fact requiring a trial exists, it is necessary to establish what such an issue would revolve around. In other words, does the standard for recovery in defamation suits which was enunciated in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) apply here?

In *New York Times*, the Supreme Court held that a public official cannot recover damages "for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not". 376 U.S. at 279–280, 84 S.Ct. at 726.

The *New York Times* case has not been given a narrow reading. Three years before the Supreme Court made any move to extend the holding in the case, Judge Lumbard wrote, in Pauling v. News Syndicate Co., Inc., 335 F.2d 659 (2d Cir. 1964):

We realize that the sole point actually determined by [the *New York Times*] decision was that the First Amendment requires a state to recognize a "privilege for criticism of official conduct," * * * extending to misstatements of fact, this being regarded as in some way the reciprocal of the privilege of federal officials against liability for defamatory statements "within the outer perimeter" of their duties. * * * Although the public official is the strongest case for the constitutional compulsion of such a privilege, it is questionable whether in principle the decision can be so limited. A candidate for public office would seem an inevitable candidate for extension; if a newspaper cannot constitutionally be held for defamation when it states without malice, but cannot prove, that an incumbent seeking reelection has accepted a bribe, it seems hard to justify holding it liable for further stating that the bribe was offered by his opponent. Once that extension was made, the participant in public debate on an issue of grave public concern would be next in line; thus, as applied to the case in hand, if a newspaper could not be held for printing Dr. Pauling's charges that a member of the Atomic Energy Commission had "made dishonest, untrue and misleading statements to mislead the American people" and that a United States Senator is "the greatest enemy * * * the United States has," as the New York Times case decided, one may wonder whether there would be sound basis for forcing it to risk a jury's determination that it was only engaging in fair criticism rather than misstating facts if it printed, falsely but without malice, that in saying all this Dr. Pauling was following the Communist line. 335 F.2d at 671 (Citations omitted)

More recently, and since the Supreme Court has handed down decisions in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) and Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), other Courts have also read *New York Times* broadly.

In *Butts*, the Court extended the actual malice standard to cover criticism of public figures who are not public officials. The Court wrote of the "strong speech and press interest in publishing material on public issues, which we have recognized as parallel to' the interest in publishing political criti-

cism present in *New York Times*". 388 U.S. at 160, 87 S.Ct. at 1994.

In *Hill*, the Court extended the actual malice standard into a new area, holding that in an invasion of privacy suit, erroneous statements about a matter of public interest "if innocent or merely negligent * * * must be protected if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive'". 385 U.S. at 388, 87 S.Ct. at 542. (Citations omitted) The Court found that the opening of a new play, based in part on a true incident, was a matter of public interest.

Lower Courts have now applied the "actual malice" standard when people and institutions involved in matters which the Courts find to be of public interest have sued for libel. An early one of these cases is United Medical Labs., Inc. v. C.B.S., Inc., 404 F.2d 706 (9th Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). Here, a mail order laboratory alleged that it had been libeled by a C.B.S. news series reporting the poor work done by such labs.

The Court first noted that it was, "of course, not possible to say just how far the [Supreme] Court [would] continue to carry * * * extensions" of *New York Times*. It then said, "But unless all other areas, not merely those of legitimate general interest but also those * * * affecting personal concern to the public, are to be artificially ignored, we are not able to see how the path upon which the Court has been moving can be regarded as having reached an end" 404 F.2d at 711.

The Ninth Circuit easily found that "conditions allegedly capable of widespreadedly affecting public health" were of public interest. 404 F.2d at 711.

In Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969), cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969), a Life Magazine article which treated the subject of gamblers who had moved from Havana to the Bahamas and which alleged that the Bahaman government was a "puppet" of gamblers, was the subject of a lawsuit. McLaney challenged as defamatory statements that he was a transplanted gambler and that he had lent helicopters to certain candidates during an election.

The Court held that "the constitutional privilege extends to discussions * * * [of] individuals, not associated with any government, if those individuals are involved in matters of important public concern. Such was the case of plaintiff here. He had injected himself into an election campaign in a small foreign country in which the announced policy of the opposition to the present government was the elimination of racketeer gambling". 406 F.2d at 573.

The Third Circuit in Rosenbloom v. Metromedia, Inc., 415 F.2d 892 (3rd Cir. 1969), cert. granted, 397 U.S. 904, 90 S.Ct. 917, 25 L.Ed.2d 85 (1970) held that raids on the distributor of nudist magazines and the injunction against harassment which he subsequently sought were matters of public interest and that news reports concerning them were subject to the *New York Times* standard.

District Courts have also applied the actual malice standard to matters which they found were of public interest. Most important of these cases for the purposes of this lawsuit is Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal.1969), a case growing out of the same Life Magazine series on organized crime which is the subject of this suit. Cerrito claimed that he had been defamed by the statement that he was head of a Cosa Nostra family in San Jose. The Court applied the *New York Times* standard, because:

> There can be no doubt that organized crime is a subject about which the public has an interest and a right to be informed. The vast expenditures of money by all branches of government, both state and federal, into [investigation of] the workings and extent of organized crime indicates the

interest of the public, as well as its right to know or be informed.[2]

2. The [President's Commission on Law Enforcement and Administration of Justice] found that any effective attack upon organized crime in this country must have sustained public support. Experience has shown that public awareness of the nature and extent of the problem results in public pressure to get rid of it. In this regard, the Commission recognized the responsibility of the American press to inform the public and stir its conscience to act in the fight against organized crime. The Challenge of Crime in a Free Society: A report by the President's Commission on Law Enforcement and Administration of Justice. 302 F.Supp. at 1073.

Other cases in which the *New York Times* standard was applied include the following: Sellers v. Time, Inc., 299 F.Supp. 582 (E.D.Pa.1969) (Time Magazine article telling of a suit against William Sellers who hit a golf ball backwards into his partner's eye. "The two outstanding points of reader interest * * * are the unusual flight of the ball and the legal decision that the defense of assumption of risk was inapplicable under the particular facts". 299 F.Supp. at 586); Bon Air Hotel v. Time, Inc., 295 F.Supp. 704 (S.D.Ga. 1969), aff'd, 426 F.2d 858 (5th Cir. May 6, 1970) Docket No. 27490. (The "decline into dishevelment" of the Bon Air Hotel, formerly the "place to be seen" at the Masters Tournament was a subject of public interest. The fact that the issue of Sports Illustrated in which the article referring to the Bon Air Hotel appeared was devoted to the Masters Tournament indicates the "high degree of interest in the event." 295 F.Supp. at 707); All Diet Food Distributors, Inc. v. Time, Inc., 56 Misc. 2d 821, 290 N.Y.S.2d 445 (Sup.Ct.N.Y. City 1967. (The *New York Times* standard applies when one is attacking the presence of a picture of his health food store on a page of the Life Science Library entitled "Food Fads and Frauds", "[c]ertainly the subject matter of the article under review is of considerable public interest." 56 Misc. 2d at 824, 290 N.Y.S.2d at 448).

The cases support a finding by this Court that organized crime and, particularly, Konigsberg's relationship to Congressman Gallagher's illegal activities are matters of public interest justifying the application of the *New York Times* standard to this defamation suit.

Having determined that the *New York Times*, or "actual malice", standard applies, it becomes necessary to fully understand what that standard is.

As noted above, the Supreme Court in *New York Times* wrote that recovery in defamation was precluded unless the statement at issue was made "with knowledge that it was false or with reckless disregard of whether it was false or not". 376 U.S. at 280, 84 S.Ct. 710 at 726.

The standard was further elaborated in St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). The Court there wrote that "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice", 390 U.S. at 731, 88 S.Ct. at 1325.

A number of cases exist in which the propriety of summary judgment in similar situations has been considered.

While Courts are reluctant to deprive a litigant of the opportunity to present his case to the trier of the facts, they have also recognized that "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of prosecution, unaffected by the prospects of its success or failure". Dombrowski v. Pfister, 380 U.S. 479, 487, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965).

In *New York Times*, the Supreme Court wrote:

[W]ould be critics * * * may be deterred from voicing their criticism,

even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which "steer far wider of the unlawful zone" * * The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments. 376 U.S. at 279, 84 S.Ct. at 725. (Citations omitted)

The Circuit Court for the District of Columbia granted summary judgment in Washington Post Co. v. Keogh, 125 U.S. App.D.C. 32, 365 F.2d 965 (1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), a case in which a public official alleged that he had been defamed. The Court wrote:

In the First Amendment area, summary procedures are even more essential. * * * Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. * * * [S]elf-censorship affecting the whole public is "hardly less virulent for being privately administered". Smith v. People of State of California, 361 U.S. 147, 154, 80 S.Ct. 215, 219, 4 L.Ed.2d 205 (1959). 365 F.2d at 968.

Summary judgment was granted in two of the Circuit cases which expanded the application of *New York Times*, viz., United Medical Labs, Inc. v. C.B.S., Inc., 404 F.2d 706 (9th Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), and Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969), cert. denied, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). It was also granted in Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal.1969), concerning the Cosa Nostra figure allegedly defamed by Life Magazine, Sellers v. Time, Inc., 299 F.Supp. 582 (E.D.Pa.1969) and Bon Air Hotel v. Time, Inc., 295 F.Supp. 704 (S.D.Ga.1969), aff'd, 426 F.2d 858 (5th Cir. May 6, 1970) Docket No. 27490.

In Thompson v. Evening Star Newspaper Co., 129 U.S.App.D.C. 299, 394 F.2d 774 (1968), concerning the alleged defamation of a public figure, Judge Leventhal wrote that the plaintiff "cannot resist a newspaper's motion for summary judgment under Rule 56 by arguing that there is an issue for the jury as to malice unless he makes some showing, of the kind contemplated by the Rules, of facts from which malice may be inferred," 394 F.2d at 776.

And, in Hurley v. Northwest Publications, Inc., 273 F.Supp. 967 (D.Minn. 1967), aff'd on opin. below, 398 F.2d 346 (8th Cir. 1968), the District Court wrote that the "mere allegation of malice, standing alone, is not sufficient to withstand a motion for summary judgment where the moving party's motion is made and supported as provided in Rule 56(e) * * *." 273 F.Supp. at 973–974. If the movant makes a showing the plaintiff must specify some evidence to be produced at trial. The mere hope of putting the defendant's witness' credibility in issue at trial is not enough. 273 F. Supp. at 974.

In the present case, the defendant has made a showing. Life has presented a series of affidavits, detailed below, from employees who were involved in the preparation of the article which refers to Konigsberg. In addition, Life has submitted its Biographical Reference File on Konigsberg. The plaintiff has submitted no affidavits and specified no evidence which he intends to produce at trial; rather, he alleges, once again, that he has been defamed and claims that Life has offered "no foundation for the statements [in the article calling him an uncaged killer, an animal on a leash, and asserting that he physically abused his debtors] which classically libel plaintiff".

Here it should be noted that the purpose of the materials offered in support of and against a motion for summary judgment is to cut through the pleadings and get to the true factual controversy, if any. In addition, Rule 56 (e) Fed.R.Civ.P. provides: "When a

motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Life supports its motion for summary judgment with the following:

1. Affidavit of Russell Sackett, Senior Editor of Life Magazine. Sackett was responsible for preparation of the article which forms the basis of the lawsuit. He details preparation of that part of the article referring to Konigsberg:

When the portion of the story which relates to Konigsberg was told to me by Smith, I believed it to be true. My belief was based upon three factors. First, I had known and worked closely with Smith for many years, and knew him to be a reliable and well informed reporter. Second, that judgment had been confirmed in September, 1967 by a panel of experts on organized crime, which had convened for the purpose of judging Smith's credibility with regard to a series of articles which he had prepared concerning Mafia operations in the United States. The panel consisted of G. Robert Blakey, Chief Counsel, U.S. Senate Subcommittee on Criminal Law and Procedure; Harold Sell, then Acting Director of the Chicago Crime Commission; John F. Shanley, former New York Chief Police Inspector; and Eliot Lumbard, Special Assistant to the Governor of New York for Law Enforcement and an Advisor to the Task Force on Organized Crime. The panel had concluded, and had formally reported to Life Magazine, that Smith's information was correct and that Smith himself was a reliable source of information regarding organized crime and its activities. Third, most of the statements made concerning Konigsberg were substantiated by reports which had already been published and which were on file at Life Magazine.

Because of the seriousness of the charges contained in this portion of the story, I asked William Lambert to make an independent check of the events related therein, and to report back to me as to his belief in their accuracy. He did so, and subsequently reported that the story was true.

In the meantime, Time, Inc. had retained William Hundley, former Chief of the Organized Crime Section of the Department of Justice, as counsel for the purpose of making yet another independent check of the facts. Hundley likewise reported that the story was true.

With these assurances, I instructed Smith to proceed with the article. He prepared a draft, which he submitted to me and which I then forwarded to Researcher Nancy Haskell with instructions to check each and every word of the article for accuracy. She did so, and returned it to me with her approval.

2. Affidavit of William Lambert, Associate Editor of Life Magazine and a "specialist" in investigative reporting. He says that prior to his work on the Life article, he knew of Konigsberg's reputation and of the report that he had led F.B.I. agents to a Mafia graveyard. To substantiate that part of Smith's story dealing with the disposal of Barney O'Brien's body he telephoned an inquiry to an attorney who had been a prosecutor in the Organized Crime Section of the Department of Justice at the time of Konigsberg's supposed statement. The attorney verified the story.

3. Affidavit of William Hundley, attorney, formerly Chief of the Organized Crime Section of the Department of Justice, retained by Life to aid in the preparation of the article in question. He says that he conducted an independent investigation to verify Smith's story. A Justice Department attorney assigned

to the United States Attorney's Office in Newark at the time in question verified Konigsberg's statement concerning disposal of O'Brien's body.

4. Affidavit of Nancy Haskell, Life Researcher. She checked Smith's article against clippings in the Biographical Reference File on Konigsberg, which she had previously assembled. She quotes some of the articles which she says confirmed the major parts of the story as it related to Konigsberg. (My reading of these articles also leads me to the conclusion that they support the major portion of the article.) She also says: "The specific instance of Konigsberg's removal of Barney O'Brien's body from Congressman Gallagher's house had not been reported in the press prior to the Life Magazine article, although there had been reports that evidence of a third body had been uncovered at the Celso farm. In checking that portion of the story, therefore, I relied upon information supplied by Sandy Smith and confirmed through independent checks by William Lambert and William Hundley".

5. Affidavit of John F. Dowd, attorney, Editorial Counsel for Time, Inc., whose duty it is to supervise the editorial process from the point of view of possible libel litigation. He says, "Because of the nature of the facts which were being discovered by the Life Magazine staff * * * I worked closely with those who were preparing the story from the beginning. That portion of the story in which plaintiff was involved was first revealed to me by Sandy Smith. Smith's contract with Life Magazine provides that, in connection with his preparation of articles concerning organized crime, he not be required to reveal his sources of information. Because of this, I felt that it was desirable that these events be independently verified. This verification was made to my satisfaction, and I approved the story for publication".

6. Biographical Reference File on Harold K. Konigsberg with news clippings covering the period from 11/1/60 to 7/6/68. The photograph Konigsberg complains of is found in the file in connection with two separate articles of recent vintage.

The affidavits and biographical reference file make it clear that there was no knowledge of falsity (if indeed, there was falsity), no serious doubt concerning the truth of any statement in the article, and certainly no reckless disregard of whether statements in the article were false or not. Plaintiff presents no facts in opposition to those offered by Life and does not promise to do so at trial. Summary judgment must issue.

Motion for summary judgment granted and complaint is dismissed, with costs.

So ordered.