The NEWS–JOURNAL COMPANY, a Delaware Corporation, Charles L. Reese, Jr., and Creed C. Black, Defendants Below, Appellants,

v.

Charles T. GALLAGHER, Jr., and Hope D. Gallagher, Plaintiffs Below, Appellees.

Supreme Court of Delaware.

July 18, 1967.

Louis J. Finger, of Richards, Layton & Finger, Wilmington, for appellants.

Harold Leshem of Booker, Leshem, Green & Shaffer, Wilmington, for appellees.

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

CAREY, Justice.

Appellants, The News-Journal Company, Charles L. Reese, Jr. and Creed C. Black, seek the reversal of an order of the Superior Court which denied their motion for summary judgment against appellees, Charles T. Gallagher, Jr. and Hope D. Gallagher, his wife. The action is one for alleged libel against Mr. Gallagher in several articles which appeared in Newspapers published by the corporate defendant, the other two appellants being respectively the Editor and Executive Editor of those papers. The issue is whether the uncontradicted evidence in the record requires a finding in appellants' favor as a matter of law.

Although the denial of summary judgment is usually not an appealable order, we decided against a dismissal because of the possibility that the case may be governed by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. If that case is applicable here, the Court below apparently applied a wrong standard in determining the motion. It held that the record contains matter from which a jury could find actual malice. Although it

did not expressly state a definition of the term "actual malice", it obviously used that expression as meaning ill will, spite or intention to do harm. But that definition does not meet the constitutional requirements laid down in the New York Times case. This is made plain in Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597, wherein it is pointed out that "ill will, evil motive, intention to do injury" do not constitute the type of malice necessary to meet the requirements of the New York Times rule. "Actual malice" means, in this connection, knowledge of falsity or reckless disregard of whether a publication is false.

■ After the case came to this Court, the opinion of the Supreme Court of the United States in Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, was published. It holds that the New York Times rule is applicable, as a constitutional matter, to newspaper publications concerning "public figures" as well as "public officials". We are, of course, bound by that decision. If Mr. Gallagher was either a public official or a public figure, he may not recover in this case in the absence of evidence that the statements complained of were false *and* were published with knowledge of the falsity or with a reckless disregard of whether they were false or true. Even if false statements are uttered as a result of mere negligence, the action will not lie. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125.

We must decide, first, whether Mr. Gallagher was a public official or a public figure and, if so, whether there is evidence in the record which would justify a jury in finding the necessary elements of actual malice. The evidence will be summarized in the light most favorable to appellees.

I

Mr. Gallagher was at all pertinent times Chairman of the Wilmington City Republican Committee. His business was that of realtor, including collection of rents for property owners. The State Highway Department had acquired numerous properties in Wilmington for the ultimate purpose of building a dual interstate freeway through the City—a Federal Aid project. Many of the buildings thereon were occupied by tenants and, as the Department did not plan to demolish them for several months, it permitted the tenants to continue in possession. The Department made arrangements with several persons to collect and remit the rentals. Mr. Gallagher was selected to collect rentals for three properties.

In 1961, the Highway Department, following the death of an employee who was in charge of rental collections discovered certain alleged shortages therein. It employed a firm of certified public accountants, Mack & Company, to make a detailed examination and report in an effort to determine the amount and sources of the shortages.

On October 17, 1961 an article appeared on the front page of the Morning News under a five-column headline, reading "Rentals Probe Extends Outside Highway Department". A subtitle read "nonemployee Questioned as Case Grows". The article stated, inter alia, that the investigation had spread to persons outside the Department and that the Attorney General's office was considering possible prosecutions.

Later that same day, Mr. Gallagher came to the newspaper's offices and talked with Mr. Reese and Mr. Black and William Frank, the author of the article. Mr. Gallagher explained to them that he was one of the persons who had been collecting rentals, but had been assigned only three properties; that the amount he believed the audit report would charge him with having collected was erroneous, and that the amount actually then due from him was less than $20; that he had experienced great difficulties in making collections; that his own records had been kept very

poorly; and that he himself had not known just how the account stood until his personal accountant had gone over those records a few days earlier and determined the amount payable. He then gave these appellants copies of certain correspondence with the Highway Department, one of which was a letter dated October 17, 1961 (the date of this conference) setting forth a statement of the account according to his books. It indicated a net balance due the Department of $106.66 and stated that his check for that sum was enclosed. He told those present that his involvement in the Mack audit was minimal and was merely the result of laxity on his part and lack of proper records in the Highway Department, and that he was eager to protect his own reputation, but was afraid that his slight involvement would be greatly exaggerated. He therefore requested the newspaper to refrain from highlighting or emphasizing his involvement and not to feature his name unfairly.

On the next day, the Morning News carried a three-column headline reading "Name May 'Bomb' Road Probe Today". The article which followed said that the audit report was to be presented to the Highway Commissioners that afternoon; that it would indicate there was about $40,000 involved in the Department's shortage; that the name of a well-known Wilmington individual who was not connected with the Department would be mentioned in the report as having handled some of the missing money; that although the identity of that person was known to many individuals, no one was willing to mention it except on an "off the record" basis. Admittedly, Mr. Gallagher was the individual referred to.

The following day, October 19, the Morning News carried an eight-column headline reading "State Rentals $48,559 Short". A one-column headline in smaller type read $17,139 Charged Withheld". In somewhat still smaller type another sub-title read "Gallagher Listed As Owing $301,

Challenges Audit". His picture appeared immediately adjoining the two smaller headlines. The article which followed stated, inter alia, that the audit report involved Mr. Gallagher as one of the persons who had collected some rents and, as of June 30, 1961, he had not turned over to the Department $301.64; that a total of $17,139 had been collected by various persons but not paid over, but that the rest of the shortage was presumptively rental balances due but uncollected; that Mr. Gallagher had appeared at the hearing and disagreed with the audit figures, and had stated that he had sent in a check for $106.66 which was all that was due for rentals he had collected. The article also discussed the amounts allegedly due from other named individuals and stated that the State Police had assisted in the investigation and that the report was being studied by the Attorney General's office. Several paragraphs in the article set forth Mr. Gallagher's denials and explanations as he had stated them to the Commissioners at the meeting.

On October 20, the Evening Journal contained an editorial concerning the audit report but did not mention Mr. Gallagher's connection therewith.

On October 27, both the Morning News and the Evening Journal carried a seven-column headline indicating that the Grand Jury had indicted another individual concerned in the shortage but had cleared Gallagher. The article thereunder stated that the Attorney General's office had presented bills of indictment to the Grand Jury and that Mr. Gallagher had voluntarily appeared and testified before that jury, as had his personal accountant and his former secretary. The article also set out the substance of their testimony and stated that the Grand Jury had ignored the bill against him.

Although several additional articles concerning the audit report were published by appellants, none of them referred to the appellee.

## II

Appellants have suggested that Mr. Gallagher was a public officer within the meaning of the New York Times rule. Whether or not that be true, it cannot be disputed that he was a public figure in the city and county by virtue of his political position. Moreover, the publicity arose out of work he was performing for a state agency, as to which the people of the state were entitled to information.

As we have earlier indicated, the rule concerning public figures announced in Associated Press v. Walker, supra, is the same as that for public officials. We say this despite a contention that the Associated Press case has modified the New York Times rule as applied to public figures. The opinion of Mr. Justice Harlan would make such a modification, but that opinion is not the holding of the majority of the Supreme Court; only three other Justices concurred in it. The majority opinion on this point was written by the Chief Justice with the concurrence of four others. It declined to apply a different standard to the two types of individuals.

A review of the record leaves us somewhat in doubt as to precisely what falsehoods are alleged to have been published by these appellants. There was a dispute, of course, between the Mack report and Mr. Gallagher as to how much the latter owed the Department prior to October 18, 1961 and whether he owed anything thereafter. In any event, we will assume that the report was wrong and that his version was correct. Whatever falsehoods there may have been, we can find no evidence in the record to justify a holding that appellants actually knew of their falsity. Appellants took no position as to who was correct by simply publishing both versions. It was hardly their function to decide which of the conflicting versions was right. The Chief Deputy Attorney General deemed the evidence sufficient to justify presentation of the matter to the Grand Jury. Its action in clearing Mr.

Gallagher was fully reported by the appellants in large headlines in both of its papers and in the articles thereunder, which rather specifically set forth the nature of the testimony given by him, his accountant and his secretary.

In our opinion, the record contains no evidence to justify a finding of actual malice, as defined in the Supreme Court cases cited herein. Those cases plainly require us, as a *constitutional* matter, to apply that definition in libel suits against newspapers by public officials or figures.

The order entered below must be reversed with instructions to grant appellants' motion for summary judgment.