2 Ill. App.3d 22 (1971)
275 N.E.2d 746
J.L.S. SNEAD, Plaintiff-Appellant,
v.
FORBES, INC., Defendant-Appellee.
No. 54501.
Illinois Appellate Court  First District.
October 6, 1971.
*23 Philip H. Corboy and James P. Chapman, of Chicago, for appellant.
Robert F. Hanley and Arthur H. Martin, of Chicago, (Jenner S. Block, of counsel,) for appellee.
Judgment affirmed.
Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:
Plaintiff J.L.S. Snead, brought this action to recover damages allegedly occasioned by certain libelous articles printed by defendant, Forbes, Inc., in its nationally distributed business magazine. Plaintiff contended that the articles which appeared in Forbes Magazine constituted libel per se (without proof of special damages required) because the article imputed inability to plaintiff to perform his duties as a professional business executive. After defendant's motion to dismiss was denied, defendant then moved for summary judgment, contending that as a matter of law, the articles were not libelous per se. The trial court granted defendant's *24 motion. On appeal, plaintiff contends that under New York substantive law, the articles, taken as a whole, constitute libel per se and in the alternative, under Illinois substantive law, the articles also constitute libel per se.
We must first summarize the contents of the two disputed articles. The first article, "A Tale of Three Drivers" appeared in the September 1, 1964 issue of Forbes Magazine (hereinafter Forbes). The second article, "Here Come the Trucks" appeared in the December 1, 1964 issue of Forbes. Both articles deal with fluctuations in the fortunes of the trucking industry, with the first article focusing on Consolidated Freightways, the nation's largest trucking company.
The first disputed article, "A Tale of Three Drivers", postulates that the creation of a successful large corporation requires a development in three stages, accompanied by what it calls "three contrasting styles of management." The article details those stages and describes the accompanying styles of management, by fixing upon the activities of the men who ran Consolidated Freightways during its growth into the nation's largest trucker. "A Tale of Three Drivers" describes the stewardships of each of Consolidated Freightways' three presidents: Leland Jones, the founder and first president, described as "The Depression Kid"; plaintiff, J.L.S. Snead, the second president, described as "The Zeckendorf of Transportation"; and William White, the third and current president, described as "Bill the Digester". The article's appraisal of each stewardship is best illustrated by the substitute to the article:
"Under three different bosses, Consolidated Freightways has gone through the pains of birth [James], wild expansion * * * [plaintiff] * * * and drastic retreat [White]. Now, it seems headed for smoother riding."
Plaintiff's achievements are discussed as illustrative of the management style characteristic of a company's middle stage of growth: "wild expansion". Plaintiff is presented as an ambitious executive who engineered an enormous growth in a short time:
"Snead as it turned out, was no manager. But he did have vision. He was a man with imagination, daring and guts, unafraid to make mistakes. In 1955 CF was just a medium-sized company; its routes stretched only from the West Coast to Chicago.
Moving headquarters from Portland to a modern office in the Menlo Park suburb of San Francisco, Snead went big time. Acquiring 27 truck companies, Snead spread Consolidated across the U.S. from coast to coast, went into Canada and Alaska and even Hawaii. By 1960 Snead had turned Consolidated into the nation's biggest trucker by far.
But Snead had gone too fast. He had boosted debt 450 per cent to *25 $60 billion and shares outstanding from 1.3 million in 1956 to 2.7 million. While his trucking operations needed attention, Snead began expanding Consolidated's non-trucking business for all it was worth. He reorganized the company, making it possible to expand under the deal with White Motor to market James' Freightliner. Today Consolidated makes about 4,000 of these $15-20,000 truck-tractors and trucks a year and White sells them. Snead also bought another winner: Transicold, which makes refrigeration equipment for vehicles and is second only to Westinghouse in this field.
Snead's other choices did not work out so well. He bought some parts of a bankrupt West Coast-to-Hawaii steamship company and went into the business himself. In two years it lost about $9 million and was liquidated. His Hawaiian truck operations could not compete against local competition. The worldwide moving company Snead set up was a big money-loser.
Signs of indigestion were everywhere. The 1960 business-cycle dip hit the trucking industry hard and Consolidated even harder. In 1960 revenues reached $152 million up 265 per cent in six years, but losses hit $2.7 million or $1.07 per share vs. a profit of $1.35 the year before."
The second disputed article, "Here Come the Trucks" is not an article about Consolidated Freightways. It does mention the company, but makes no mention of the plaintiff. Rather it is a general review of the trucking industry's fortunes from the beginning of the 1930's to the mid 1960's. The specific example in the article which plaintiff objects to reads as follows:
"Consolidated is perhaps the most dramatic example of the kind of difficulties the big companies got themselves into. Founded in 1929 as Federal Auto Freight in a merger of four small truck lines, the company expanded steadily during the Depression and after. In 1954, the company suddenly went on a buying spree. Within six years, it acquired more than a dozen other trucking companies. This made Consolidated the nation's biggest motor carrier, but it also made Consolidated a mess. To finance the acquisitions, the company had to boost its debt by 452 per cent to $60.4 million. It also had to increase the number of shares outstanding from 1.3 million to 2.7 million.
Some of the acquisitions were excellent  but not all. Consolidated bought freight lines that duplicated each other's facilities. It bought into three of Hawaiian Textron's steamships to found a fishyback service. The idea was for the ships to carry freight-filled containers to Hawaii, where Consolidated trucks and trailers would pick them up and haul them to their destination. It proved a loser. Consolidated had to get rid of the ships."
*26 The article then proceeds to illustrate examples of "how several other big companies got themselves into trouble."
 1, 2 We must first determine whether the trial court was correct in applying Illinois law to the legal questions raised by defendant's motion for summary judgment. The Illinois Supreme Court recently set forth new rules for determining choice of law questions. In Ingersoll v. Klein (1970), 46 Ill.2d 42, 262 N.E.2d 593, the court stated that the reviewing court "will apply the `most significant contacts' rule, rather than the doctrine of lex loci delicti, as the local law which has the most significant relationship with the occurrence and with the parties * * *". As applied to multistate defamation cases, the state of most significant relationship will usually be the state where the person allegedly defamed was domiciled at the time. (See Draft of the Restatement of the Law, Second, Conflicts of Law (1968), Section 150.) Multistate Defamation (2), which states: "When a natural person claims that he has been defamed by an aggregate communication, the state of the most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state." The assumption here is that the place of greatest potential injury to the reputation of the plaintiff will be the place where plaintiff lived and worked.
 3 In the instant case, the place of greatest potential injury to the reputation of the plaintiff is Illinois. Plaintiff's affidavit reveals that he has never been domiciled in New York. Plaintiff contends that the law of defendant Forbes' principal place of business, New York, should be applied to this multistate action. Plaintiff admits his cause would thereby be "made easier since New York, like most other states, does not follow the innocent construction rule." We find nothing in plaintiff's contention to dissuade us from applying the `most significant contacts' rule, as set forth in Ingersoll v. Klein, supra, and the Restatement, supra. Accordingly, we find that the trial court was correct in applying Illinois law to the multistate defamation case before us.
 4, 5 According to Illinois law, articles are libelous per se if they are "so obviously and naturally hurtful to * * * plaintiff * * * that proof of their injurious character can be, and is, dispensed with." Bontkowski v. Chicago Sun Times (1969), 115 Ill. App.2d 229, 252 N.E.2d 689. Plaintiff contends that the two articles are objectionable upon the grounds that they impute inability to perform and prejudice plaintiff in his profession. In determining whether or not the articles did so prejudice him, they must be read as a whole, and if so read they are capable of an innocent construction, they must be so construed. As the court said in John v. Tribune Company (1962), 24 Ill.2d 105, 108:
"[The innocent construction rule] holds that the article is to be read *27 as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law."
 6 When the above summarized articles are so read, the articles cannot be made into a direct charge of professional incompetence. The reference to plaintiff as the "Zeckendorf of Transportation" is a reference to one of the foremost real estate developers of our time. Even that part of the article which states that plaintiff "was no manager" is tempered by such statements as "but he did have vision  He was a man with imagination, daring and guts * * *". These statements are far from being naturally and unambiguously harmful to plaintiff in his role as professional executive.
 7, 8 We also point out that under New York Times v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, and its progeny, the constitutional guarantees of freedom of speech and press extend not only to "public officials" but also to "public figures" and "matters of public interest." In Farnsworth v. Tribune Co. (1969), 43 Ill.2d 286, 253 N.E.2d 408, the Illinois Supreme Court found that "medical quackery is an area of critical public concern, commentary concerning which is entitled to protection of free speech and press guarantees of the Constitution." In the instant case we find that the challenged articles describing a prominent business executive in a vitally important industry were fair comment on "matters of public interest" dealing with "a public figure."
 9, 10 In light of New York Times v. Sullivan, supra, and its progeny, we also find that there was no showing of facts which would indicate that the articles in suit here were published with actual malice against plaintiff, or with knowledge that they were false, or in reckless disregard of whether they were false. It is plaintiff's obligation on the motion for summary judgment, as well as at trial, to bring forth all the facts he believed would satisfy his burden of proving actual malice. Plaintiff failed in his burden and pleaded only conclusory allegations.
For these reasons, the judgment of the Circuit Court of Cook County is affirmed.
Judgment affirmed.
BURMAN and DIERINGER, JJ., concur.