**Bob ADAMS, Appellant**
**(Plaintiff below),**

**v.**

**FRONTIER BROADCASTING COMPANY,**
**Appellee (Defendant below).**

**No. 4475.**

Supreme Court of Wyoming.

Oct. 21, 1976.

Bob Adams, pro se.

Douglas Madison and Byron Hirst, Hirst, Applegate & Dray, Cheyenne, for appellee.

Before GUTHRIE, C. J., Mc-CLINTOCK, THOMAS and ROSE, JJ., and ARMSTRONG, District Judge, Retired.

THOMAS, Justice.

The essential conflict to be resolved in this case occurs between the common law individual right to be free from defamation and the right of free speech preserved·by both the First Amendment to the Constitution of the United States and Art. 1, § 20 of the Constitution of the State of Wyoming. Specifically, the Court is called to decide whether to adopt a rule requiring private censorship or deny damages to an individual for defamation. For the reasons which follow we are compelled to reject the requirement of censorship in favor of safeguarding the fundamental right of free speech even though this result forecloses the individual from recourse for defamation.

The appeal is taken by Bob Adams (referred to hereafter as Adams) from a summary judgment entered in favor of the appellee, Frontier Broadcasting Company (referred to hereafter as Frontier) in Adams' action for defamation. The action was premised upon a comment made by an anonymous telephone caller which was broadcast directly over Frontier's assigned radio frequency operated under the call letters KFBC, as a part of Frontier's radio talk show, "Cheyenne Today." For purposes of the Motion for Summary Judgment Frontier admitted:

"* * * That on 21 July 1972 an unknown person called in to Frontier's radio program KFBC to a radio program

conducted by its employee, Larry Birleffi, called 'Cheyenne Today' stating that she wished to read a prepared statement 'Please don't stop me', and thereupon said anonymous caller stated that Adams 'had been discharged as Insurance Commissioner for dishonesty.' "

Adams sought recovery for defamation on the grounds of "violation of regulations, provisions, directives and requirements of the Federal Communications Commission," and the "careless, negligent and wrongful conduct of defendant [Frontier] in failure to monitor, control, maintain and supervise the use of its facilities during the program." The record and the brief of Adams and his argument to this Court demonstrate that the specific factual premise for his contentions was the failure of Frontier to use a so-called "tape delay system." Such a system tape records phone calls, like the one involved in this instance, and they are not broadcast for the period of an automatic time lag, which usually is only ten seconds or less in duration. An electronic delay system was available to Frontier on July 21, 1972, but it was not used in connection with the KFBC talk show, "Cheyenne Today."

Frontier, as a defense and the premise of its Motion for Summary Judgment, asserted the constitutional privilege attaching to published comments relating to a public official or a public figure. The privilege relied upon is founded upon the First Amendment to the Constitution of the United States of America,[1] which is made binding upon the states by the Fourteenth Amendment, and was judicially announced in the opinion of the Supreme Court of the United States in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964) in the following language:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. * * * "

Frontier, of course, also relied upon the absence of any showing of actual malice.

The record before us demonstrates that the district court, in granting the summary judgment to Frontier, determined that the undisputed facts disclosed no issue of any material fact with respect to the comment which was broadcast, and which was assumed, for purposes of the summary judgment, to be defamatory to Adams. The record also demonstrates that the district court concluded, on the basis of facts which it found to be undisputed, that Adams was a public figure within the theories and definitions promulgated by the Supreme Court of the United States in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, reh. den. 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967); and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Having concluded that Adams was a public figure as a matter of law, the district court applied the rule of privilege found in *New York Times Co. v. Sullivan*, supra, and held, also as a matter of law, that the publication was not made with "actual malice" as that term is there defined. Specifically, the district court held that the failure to utilize an electronic delay system did not constitute reckless disregard within the meaning of the doctrine of *New York Times Co. v. Sullivan*, supra.

■ The concept of a public figure is involved in this case because it affects the freedom of the states to adopt standards of liability for defamation. *New York Times Co. v. Sullivan*, supra; *Curtis Publishing Co. v. Butts*, supra, *Gertz v. Robert Welch, Inc.*, supra; and *Walker v. Pulitzer Publishing Company*, 394 F.2d 800 (8th Cir.

1. Art. 1, § 20 of the Constitution of the State of Wyoming, also protects the right of free speech.

1968).[2] We must, therefore, determine if the conclusion of the trial court that Adams is a public figure is correct. If so, we must then decide whether the trial court correctly held that the law justifies Frontier's failure to use an electronic delay system in connection with the broadcast of its talk show, "Cheyenne Today," thereby permitting the instantaneous publication of the defamatory remark pertaining to Adams.[3] A negative answer to either of these questions would result in this case being reversed for further proceedings in the trial court. Both must be examined in the light of one of our constitutional lodestars, freedom of speech.

In his brief Adams does not oppose the district court conclusion that on the undisputed facts he is to be considered a public figure as a matter of law. At argument, however, he stated that he did not concede the application of the New York Times doctrine to him. The record demonstrates, without any dispute, that Adams, in addition to his real estate and insurance business, was an active politician and candidate. In both 1950 and 1952 he ran unsuccessfully for the Wyoming State Legisla-

ture. In 1951 he was elected a commissioner of the City of Cheyenne, and he was defeated for reelection for that same office in 1953. In 1954 he was an unsuccessful candidate for the office of State Auditor, and in 1956 he was elected to the Wyoming State Legislature. In 1958 he again was an unsuccessful candidate for the office of State Auditor, and in 1960 he was an unsuccessful candidate for the State Legislature. He served as a member of the Laramie County Library Board from 1957 to 1959, and was appointed Insurance Commissioner of the State of Wyoming in 1959. In 1962 he was an unsuccessful candidate for the office of State Treasurer, and in 1964 he was again elected to the State Legislature. In 1966 and 1970 he again ran for the office of State Treasurer, unsuccessfully on both occasions. Adams admitted, at the taking of his deposition, that he was preparing to be a candidate for State Treasurer in the 1974 election. In his deposition he advised that he would like to be a public figure, and that he used for purposes of identification either a "legislative card" or a "State Treasurer Candidate card."

2. Although not specifically mentioned in his pleading, Adams' theory would invoke the provisions of § 1-872, W.S., which provides: "The owner, licensee or operator of a visual or sound radio broadcasting station or network of stations, and the agents or employees of any such owner, licensee or operator, shall not be liable for any damages for any defamatory statement published or uttered in or as a part of a visual or sound radio broadcast, by one other than such owner, licensee or operator, or agent or employee thereof, unless it shall be alleged and proved by the complaining party, that such owner, licensee, operator, such agent or employee, has failed to exercise due care to prevent the publication or utterance of such statement in such broadcast." This statute defines the standard of liability imposed upon visual or sound radio broadcasters where the standard of liability described in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964), is not applicable. The states are free to adopt their own standards of liability in connection with the rights of those who are neither public officials nor

public figures. As will be seen, § 1-872, W.S., has no application in this controversy.

3. Adams states the issues presented for review in connection with his basic contention that the trial court erred in granting Frontier's Motion for Summary Judgment as follows: "Whether the trial court erred in granting defendant's motion for summary judgment in that:
"1. Plaintiff came forward under Rule 56, W.R.C.P. to make a sufficient evidentiary showing that genuine issues of material fact exist which require a jury factual decision after development of a full trial.
"2. Defendant was not entitled to judgment as a matter of law.
"3. Plaintiff has presented evidence of malice, and plaintiff has indicated that he can present additional evidence to a jury that will make a prima facie case of 'actual malice.'
"4. Plaintiff was denied 'right of reply' under the Fairness Doctrine of the Federal Communications Commission.
"5. The honesty or dishonesty of plaintiff is material to disposition of this case."

In addition to his purely political activities he promoted the Casper Troopers, a nationally recognized drum and bugle corps. At one point in time he was made an honorary Trooper, but later developments resulted in his motives for this activity being questioned. The contention was that he was using this as a political gambit to create an impression that he was endorsed by that organization. The resultant controversy did generate a good deal of publicity in which Adams was prominently named. There also was a considerable amount of publicity about the fact that he resigned from the office of Insurance Commissioner, and that event figured prominently in his campaigns for public office after that time. These are the facts which the record discloses, and Adams' denial that he is a public figure does not serve to counteract the evidentiary facts in the record.

Addressing the status of Adams as a public figure, the rule of *New York Times Co. v. Sullivan,* supra, with respect to the constitutional privilege, was extended from "public officials" to "public figures" in *Curtis Publishing Co. v. Butts,* supra. The public figure concept then was refined in *Gertz v. Robert Welch, Inc.,* supra. There the Court stated some definitions that have been applied alternatively by other courts. It first said, at 418 U.S. 342, 94 S.Ct. 3008, alluding to the public person concept:

" * * * Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures * * *."

Later the Court said, at 418 U.S. 351, 94 S.Ct. 3012, with respect to the status of a public figure:

" * * * That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

■■■ The status of a public figure has been recognized by the courts in a variety of situations.[4] The record before us shows

---

4. The courts have applied the public figure criteria for purposes of invoking the application of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964) in the following circumstances: *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (Urban real estate developer who was negotiating with city officials to obtain zoning variances); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), reh. den. 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967) (Athletic director who had previously been a well-known university football coach, and in the companion case of *Associated Press, Inc. v. Walker,* a former army general who had taken a strong public stand on certain political issues); *Time, Inc. v. Johnston,* 448 F.2d 378 (4th Cir. 1971) (Former professional basketball player who still was engaged in basketball as a college coach); *Vandenburg v. Newsweek, Inc.,* 441 F.2d 378 (5th Cir. 1971), cert. den. 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971) (College track coach involved in dispute relative to participation by black members of his team at a club which was charged with discrimination membership policies); *Dacey v. Florida Bar, Inc.,* 427 F.2d 1292 (5th Cir. 1970) (Author of a best-selling book relating to methods of avoiding probate); *Time, Inc. v. McLaney,* 406 F.2d 565 (5th Cir. 1964), cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969) (Individual who injected himself into an election campaign in a small foreign country by contributing substantial material aid for the purpose of lending direct influence to the election of a national government); *Cepeda v. Cowles Magazine and Broadcasting, Inc.,* 392 F.2d 417 (9th Cir. 1968), cert. den. 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968) (Extraordinary and famous baseball player); *Walker v. Pulitzer Publishing Co.,* 394 F.2d 800 (8th Cir. 1968) (Same individual involved in the companion case in *Curtis Publishing Co. v. Butts,* supra); *Meeropol v. Nizer,* 381 F.Supp. 29 (S.D.N.Y.1974) (Children of persons tried and convicted of conspiring to transmit national defense information to a foreign government); *Pauling v.*

Note 4—Continued

*Globe-Democrat Publishing Company*, 362 F.2d 188 (8th Cir. 1966), cert. den. 388 U.S. 909, 87 S.Ct. 2097, 18 L.Ed.2d 1347 (1967) (Renowned chemistry professor, winner of the Nobel Prize and the Nobel Peace Prize, publicly asserting a position concerning the promotion of a nuclear test ban treaty); *Carey v. Hume*, 390 F.Supp. 1026 (D.D.C.1975) (General counsel to the United Mine Workers of America); *Adey v. United Action for Animals, Inc.*, 361 F.Supp. 457 (S.D.N.Y.1973), aff'd without opinion 493 F.2d 1397 (2nd Cir. 1974), cert. den. 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974) (Doctor involved in planning and execution of a space flight involving a monkey); *Hensley v. Life Magazine, Time, Inc.*, 336 F.Supp. 50 (N.D.Cal. 1971) (Minister, together with his Universal Life Church, because material about them concerned the general public interest); *News-Journal Company v. Gallagher*, Del., 233 A. 2d 166 (1967) (Realtor who was chairman of city Republican Committee involved in publicity relating to work he performed for a state agency); *Thompson v. Evening Star Newspaper Company*, 129 App.D.C. 299, 394 F.2d 774 (1968), cert. den. 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968) (Public relations man who was a founder and leader of a group advocating slate for the Democratic Party District Columbia offices and who was Chairman of the Campaign Committee); *Gibson v. Maloney*, Fla.App., 231 So. 2d 823 (1970), cert. den. 398 U.S. 951, 90 S.Ct. 1871, 26 L.Ed.2d 291 (1970) (Newspaper publisher who had established editorial policy against and attempted to arouse public indignation against interests controlling a local telephone company); *Johnson v. Board of Junior College Dist. #508*, 31 Ill.App.3d 270, 334 N.E.2d 442 (1975) (Junior College professors who became actively engaged in a college controversy as to books to be used in their classes); *Basarich v. Rodeghero*, 24 Ill.App.3d 889, 321 N.E.2d 739 (1974) (Coaches and teachers in a high school who consistently were subjects of intense public interest and substantial publicity); *Snead v. Forbes, Inc.*, 2 Ill.App.3d 22, 275 N.E.2d 746 (1971) (Former president of a large trucking company who was prominent in the industry); *A. S. Abell Co. v. Barnes*, 258 Md. 56, 265 A.2d 207 (1970), cert. den. 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971) (Candidate for election as a delegate to a state constitutional convention); *Kapiloff v. Dunn*, 27 Md.App. 514, 343 A.2d 251 (1975), U.S. appeal pending (High school principal held to be within the public figure-public official classification for purposes of application of New York Times doctrine); *Tropoli v. Boston Herald-Traveler Corp.*, 359 Mass. 150, 268 N.E.2d 350 (1971) (Suspect in a 1.5 million dollar mail robbery who chose to publicly expose himself by granting interviews and press conferences in conjunction with others also suspects); *Rose v. Koch*, 278 Minn. 235, 154 N.W.2d 409 (1967) (Sociology professor who had been a state legislator and had an international reputation as an author and lecturer); *Beatty v. Ellings*, 285 Minn. 293, 173 N.W.2d 12 (1969), cert. den. 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63, reh. den. 399 U.S. 917, 90 S.Ct. 2196, 26 L.Ed.2d 576 (1970); *Beatty v. Republican Herald Publishing Company*, 291 Minn. 34, 189 N.W.2d 182 (1971) (Individual engaged in activities opposing an urban renewal project); *Perkins v. Mississippi Publishers Corp.*, Miss., 241 So.2d 139 (1970) (Prominent politician who had conducted past campaigns for city and state officers and who, four or five weeks before alleged libel, had concluded campaign for U.S. Congress); *Lloyds v. United Press International, Inc.*, 63 Misc.2d 421, 311 N.Y.S.2d 373 (1970) (Foremost trainer-driver of standard bred horses); *Gilberg v. Goffi*, 21 A.D.2d 517, 251 N.Y.S.2d 823, 19 A.L.R.3d 1348 (1964), aff'd, 15 N.Y.2d 1023, 260 N.Y.S.2d 29, 207 N.E.2d 620 (1965) (Law partner of the mayor of a city where alleged false statement involved conflict of interest in practicing in local city court); *Foster v. Laredo Newspapers, Inc.*, Tex.Civ.App., 530 S.W.2d 611 (1975) (County surveyor who had been employed by Webb County as a consultant engineer in various public projects and was involved in the activities giving rise to the alleged defamation, who also was held to be a public official as well as a public figure); *Exner v. American Medical Association*, 12 Wash.App. 215, 529 P.2d 863 (1974) (Doctor who was actively opposed to fluoridation and publicly set forth his position); *Tilton v. Cowles Publishing Company*, 76 Wash.2d 707, 459 P.2d 8 (1969), cert. den. 399 U.S. 927, 90 S.Ct. 2238, 26 L.Ed.2d 792 (1970) (Members of the Executive Committee of the Spokane area Safety Council, an organization made up of the members of the policemen's and firemen's union, who were involved in a political decision with respect to a "city manager" or a "strong mayor" form of city government); *Grayson v. Curtis Publishing Company*, 72 Wash.2d 999, 436 P.2d 756 (1967) (College head basketball coach); *Sprouse v. Clay Communication, Inc.*, W.Va., 211 S.E.2d 674 (1975), cert. den. 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975) (Practicing attorney who had been involved in an unsuccessful campaign for governor of the State of West Virginia); *Richards v. Gruen*, 62 Wis.2d 99, 214 N.W.2d 309 (1974) (Individual who criticized alderman who was also running for office thereby involved himself in a matter of public and general interest).

clearly that Adams voluntarily did inject himself into the fund raising effort for the Crow Creek Project, and in so doing he did become a public figure for a limited range of issues which were the subject of the broadcast on the talk show, "Cheyenne Today," about which Adams complains. Furthermore, the record also shows that Adams was successful in several of his efforts at seeking public office. Quite likely he is a public figure for all purposes and in all contexts. *A. S. Abell Company v. Barnes,* 258 Md. 56, 265 A.2d 207 (1970), cert. den. 403 U.S. 921, 91 S.Ct. 2224, 29 L.Ed.2d 700 (1971); and *Perkins v. Mississippi Publishers Corporation,* Miss., 241 So.2d 139 (1970). Nowhere is it said that the status of a public figure hinges upon success in the endeavors which lead to that status. Logic compels the conclusion that one might be a public figure although the endeavors which led to that status uniformly were unsuccessful. Suffice it to say, however, that we answer the first question in the affirmative, that is, the trial court correctly held Bob Adams to be a public figure, as a matter of law, based upon the undisputed facts in the record.

■ Adams' status as a public figure invokes the actual malice standard for liability of *New York Times Co. v. Sullivan,* supra. This standard was recognized and adopted by this Court in *Phifer v. Foe,* Wyo., 443 P.2d 870 (1968). The justification for treating public figures under a different standard of liability from that applied to private citizens is found in the assumption that the public figure has a ready access to the media and can achieve redress of defamatory comments through his public rebuttal. The fact that in this instance those who were involved in the actual broadcast promptly and effectively rebutted the comment from the anonymous caller serves as a concrete illustration of the validity of this justification.

■ A plaintiff in a case such as this, in which the constitutional privilege must be overcome, is charged with a special burden of persuasion requiring him to demonstrate actual malice with convincing clarity. *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); and *New York Times Co. v. Sullivan,* supra, at 376 U.S. 285, 286, 84 S.Ct. 710. As noted later, in these cases summary judgments have frequently been relied upon by the courts because where appropriate such an expeditious disposition of the action affords the best protection to the constitutional privilege. This approach has led to a unique requirement, which we emphasize is limited to cases which involve the constitutional privilege defined by the *New York Times* case. In ruling upon the presence of a genuine issue of fact as to the existence of actual malice the trial judge must decide whether:

"  *  *  *  [T]he plaintiff has offered evidence of *a sufficient quantum to establish a prima facie case,* and the offered evidence *can be equated with the standard or test of 'convincing clarity'* prescribed by United States Supreme Court decisions  *  *  *." *Chase v. Daily Record, Inc.,* 83 Wash.2d 37, 43, 515 P.2d 154, 157 (1973)

Accord, *United Medical Laboratories v. Columbia Broadcasting System, Inc.,* 404 F.2d 706 (9th Cir. 1968), cert. den. 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Buchanan v. Associated Press,* 398 F.Supp. 1196 (D.D.C.1975).

Turning to the facts surrounding the actual radio broadcast, the record, without dispute, demonstrates that the Mayor of the City of Cheyenne learned that certain federal funds were available for cleaning up and improving the lands adjoining Crow Creek where it flows through the City of Cheyenne if $20,000 in matching funds could be secured by the city. This project appeared to be desirable for several reasons, but, because of budgetary limitations and limitations upon alternative funds available to the city, it appeared that it would be necessary to raise the $20,000 through public contributions. Adams was a friend and political supporter of the

Mayor, and upon being advised of the problem Adams recommended to the Mayor that the project should not be abandoned. Adams offered his assistance in raising the requisite $20,000, and suggested that the Mayor call upon some substantial citizens to chair a committee for the fund raising effort. Adams suggested two particular individuals because he felt that it would be helpful to them in connection with their individual campaigns for political office. The available time was short, and, after the program proposed by Adams was espoused by the Mayor, Adams arranged for the Mayor to appear on the talk program, "Cheyenne Today." Adams himself did not appear on the show.

During the course of the interview by the show moderator, Larry Birleffi, the Mayor explained the nature of the project and the need for the money, and named the persons who were associated with the fund drive, including Bob Adams. Questions then were invited, and at this juncture the phone rang in the broadcast studio and an unknown person stated to Mr. Birleffi, who answered the phone, that she wished to read a prepared statement and "please don't stop me." The anonymous caller then stated in the interrogative mode that Adams "had been discharged as Insurance Commissioner for dishonesty." As the case comes to this Court it is conceded that the comment was defamatory.

■ In support of his contention that the district court erred in granting the summary judgment, Adams contends that in his premotion affidavits, depositions, interrogatories, and exhibits, he presented evidence of actual malice sufficient to create genuine issues as to that material fact. At another point in his brief, though, Adams concedes that the finding of the district court that the record "fails to show the defendant [Frontier] had actual knowledge of the falsity of the statements broadcast" is correct. This Court accepts Adams' concession on this point which removes from the case any factual issue as to the existence of actual malice in the

limited sense of publishing a falsehood with knowledge that it is false. We note in passing, however, that the district court was correct in its determination on this point, regardless of Adams' concession, because the evidence of claimed malice presented by Adams related to firms and persons who were not, on the record, in any way shown to be connected with Frontier so as to impute to Frontier any malice that the other persons or firms may have held toward Adams. Furthermore, *Beckley Newspapers Corp. v. Hanks,* supra, and *Rosenblatt v. Baer,* 383 U.S. 75, 84, 86 S. Ct. 669, 15 L.Ed.2d 597 (1966), make it clear that bad or corrupt motives, spite, hostility, ill will, or deliberate intention to harm are not material with respect to the application of the definition of actual malice set forth in *New York Times Co. v. Sullivan,* supra. Since these facts would not tend to prove or disprove any element of Adams' cause of action a genuine issue as to any of them would not relate to a material fact, and would not inhibit the granting of summary judgment. *Johnson v. Soulis,* Wyo., 542 P.2d 867 (1975).

■ Adams also contends that he was denied his right of reply under the fairness doctrine of the Federal Communications Commission. We are satisfied that he must resort to another forum to enforce that right. He does suggest, however, that this denial evidences actual malice on the part of Frontier. We hold that this fact, as claimed by Adams, has no relevance with respect to the existence of malice at the time of publication as malice is defined for purposes of applying the *Times* doctrine. With respect to Adams' contention that his honesty or dishonesty is material to the disposition of this case, we do not agree. It is assumed that the comment was defamatory to Adams, and this assumption assumes Adams' honesty.

Adams argues to this Court that whether Frontier's failure to use an electronic delay system which it had available constituted reckless disregard, equating with actual malice under the *New York Times Co. v.*

*Sullivan,* supra, doctrine, is a factual question. While this contention by Adams suggests the critical point in this entire case it is somewhat wide of the mark. Reckless disregard as alluded to in *New York Times Co. v. Sullivan,* supra, connotes that, "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).[5] If reckless disregard is to be invoked, it was and is Adams' burden to point to factual material in the record which would constitute proof that Frontier in fact entertained serious doubts with respect to the truth of this publication.[6] Adams, under the circumstances of this case, is unable to meet his burden in this regard.

The question posed with respect to the application of the constitutional standard of liability in a case such as this is a perplexing one. Adams relies upon *Snowden v. Pearl River Broadcasting Corp.,* La. App., 251 So.2d 405 (1971), which does hold that reckless disregard under the criteria set forth in *St. Amant v. Thompson,* supra, is present in an instance in which defamatory remarks were directly broadcast over a radio talk show because of the failure to use an electronic delay system. The thrust of that opinion, however, is diluted by the persuasive argument of the concurring judge that there was no necessity to invoke the standard of liability of *New York Times Co. v. Sullivan,* supra, because the person defamed was not a public figure. The case, of course, was decided before *Gertz v. Robert Welch, Inc.,* supra, which added specificity to the definition of a public figure, and additional significance to the Snowden dissent. Frontier relies upon *Demman v. Star Broadcasting Co.,* 28 Utah 2d 50, 497 P.2d 1378 (1972). The Supreme Court of Utah there upheld the granting of a summary judgment under circumstances similar to this, but there is no real discussion of the concept of reckless disregard.

■ The standard of actual malice assumes in both of its aspects (publication with actual knowledge of falsity or publication while entertaining serious doubts as to truth) an opportunity on the part of the publisher to evaluate the matter to be published and form some conclusion as to falsity or doubts as to truth. By not using the electronic delay system, which resulted in instantaneous publication of the offending remark, Frontier deprived itself of any opportunity to evaluate the information published and form a conclusion as to falsity or a doubt with respect to truth. The legal effect in an action such as this is that this combination of circumstances makes it impossible for Adams to factually establish the actual malice required to show a violation of the constitutional standard. This Court must resolve the question as to which party must bear the impact of the injury resulting from such a combination

5. This proposition is stated somewhat differently in *Garrison v. State of Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), in which the Court spoke of " * * * [O]nly those false statements made with the high degree of awareness of their probable falsity * * *." This seems to be the equivalent of "serious doubts as to the truth," and we rely upon the rule promulgated in the civil context in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

6. *Thompson v. Evening Star Newspaper Company,* 129 U.S.App.D.C. 299, 394 F.2d 774 (1968), cert. den. 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160 (1968); *Walker v. Pulitzer Publishing Company,* 394 F.2d 800 (8th Cir. 1968); *Carey v. Hume,* 390 F.Supp. 1026 (D.D.C.1975); *Meeropol v. Nizer,* 381 F. Supp. 29 (S.D.N.Y.1974); *Kent v. Pittsburgh Press Company,* 349 F.Supp. 622 (W. D.Pa.1972); *Hensley v. Life Magazine, Time, Inc.,* 336 F.Supp. 50 (N.D.Cal.1971); *Cerrito v. Time, Inc.,* 302 F.Supp. 1071 (N.D. Cal.1969), aff'd 449 F.2d 306 (1971); *Arber v. Stahlin,* 10 Mich.App. 181, 159 N.W.2d 154 (1968); *Beatty v. Ellings,* 285 Minn. 293, 173 N.W.2d 12 (1969), cert. den. 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63 (1970), reh. den. 399 U.S. 917, 90 S.Ct. 2196, 26 L.Ed.2d 576 (1970); *Foster v. Laredo Newspapers, Inc.,* Tex.Civ.App., 530 S.W.2d 611 (1975).

of circumstances and why is the burden to be so assigned. While factually distinguishable, *New York Times Co. v. Sullivan,* supra, and other cases which hold that failure to investigate is insufficient to demonstrate reckless disregard suggest that simply depriving oneself of the opportunity to evaluate the information and form a conclusion with respect to falsity or doubt as to truth does not amount to reckless disregard under the Times rule. *St. Amant v. Thompson,* supra; and *LaBruzzo v. Associated Press,* 353 F.Supp. 979 (W.D.Mo. 1973). We hold that Adams must be foreclosed from recovery under these circumstances.

This result is supported by the same factors which were relied upon in the development of the federal rule with respect to liability founded in the Times doctrine. In addition, this case arises within an administered area which appropriately has been preempted by the federal government, and within which the federal government has legislated, regulated, and litigated extensively. In the law generally and within this area particularly there has developed a strong policy against censorship. We use the term "censorship" to connote all factors which would inhibit the freedom and spontaneity of the public dialogue. It includes administratively imposed requirements, judicially mandated requirements, and those limitations which voluntarily are imposed by those involved in disseminating the public dialogue. The history of the federal approach in this particular area is outlined in *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 89 S.Ct. 1794, 23 L. Ed.2d 371 (1969). For our purposes the approach taken, as recognized by the Supreme Court of the United States, is summarized by the following language from 395 U.S. 390, 89 S.Ct. 1806:

"  *  *  *  It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee.  *  *  *  It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.  *  *  *"

Another key to resolution of this issue is suggested by the following language, more general in application, from *New York Times Co. v. Sullivan,* supra, at 376 U.S. 270, 84 S.Ct. 721:

"Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it well may include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.  *  *  *"

It is in this context that we are urged by Adams to decide that failure to use an electronic delay device meets the constitutional standard of "reckless disregard," at least to the extent that a factual issue requiring trial is present.

After any such ruling, broadcasters, to protect themselves from judgments for damages, would feel compelled to adopt and regularly use one of the tools of censorship, an electronic delay system. While using such a system a broadcaster would be charged with the responsibility of concluding that some comments should be edited or not broadcast at all. Furthermore, we must recognize the possibility that the requirement for the use of such equipment might well, on occasion, tempt the broadcaster to screen out the comments of those with whom the broadcaster, for whatever reasons, did not agree and then broadcast only the comments of those with whom the broadcaster did agree. The danger of the possible application of a power to censor to slant public debate and dialogue is apparent to all. Yet, among the temptations which are most difficult to resist is the temptation to mold public opinion so that it concurs with one's own.

Under the result urged by Adams the primary motive for self-censorship would

be that of avoiding the payment of damages and even avoiding the litigation by which damages are sought with its associated expense and inconvenience. The best procedural protection for freedom of speech, which the New York Times Co. v. Sullivan, supra, standard is designed to protect, is found in the remedy of summary judgment which the courts have utilized freely in such cases.[7] The chilling effect of litigation and the associated expense and inconvenience frequently have led courts to conclude that summary judgment is the most appropriate remedy in an instance such as this in order to minimize that chilling effect as much as possible. Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969), cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); Thompson v. Evening Star Newspaper Company, 129 U.S.App.D.C. 299, 394 F.2d 774 (1968), cert. den. 393 U.S. 884, 89 S.Ct. 194, 21 L. Ed.2d 160 (1968); Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F. 2d 965, 20 A.L.R.3d 972 (1966), cert. den.

385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); Meeropol v. Nizer, 381 F.Supp. 29 (S.D.N.Y.1974); Cardillo v. Doubleday and Company, Inc., 366 F.Supp. 92 (S.D. N.Y.1973); Kent v. Pittsburgh Press Company, 349 F.Supp. 622 (W.D.Pa. 1972); Konigsberg v. Time, Inc., 312 F. Supp. 848 (S.D.N.Y.1970); Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D.Cal. 1969).

Recognizing clearly the possibility for defamation to occur on open microphone talk shows such as "Cheyenne Today," we hold that the commitment to "uninhibited, robust, and wide-open" public debate must, in the balance, outweigh the common law right of an individual who is a public official or public figure to be free from defamatory remarks. Programs such as this are the modern version of the town meeting in vogue earlier in our country's history, and they are utilized in a similar way to afford every citizen an opportunity to speak his mind on any given issue. Adoption of the rule urged by Adams, to the ef-

7. Time, Inc. v. Johnston, 448 F.2d 378 (4th Cir. 1971); Dacey v. Florida Bar, Inc., 427 F.2d 1292 (5th Cir. 1970); Time, Inc. v. McLaney, 406 F.2d 565 (5th Cir. 1969), cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969); United Medical Laboratories v. Columbia Broadcasting System, Inc., 404 F.2d 706 (9th Cir. 1968), cert. den. 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); Walker v. Pulitzer Publishing Company, 394 F.2d 800 (8th Cir. 1968); Thompson v. Evening Star Newspaper Company, 129 U.S.App.D.C. 299, 394 F.2d 774 (1968), cert. den. 393 U.S. 884, 89 S.Ct. 194, 21 L. Ed.2d 160 (1968); Baldine v. Sharon Herald Company, 391 F.2d 703 (3rd Cir. 1968); Washington Post Company v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 20 A.L.R.3d 972 (1966), cert. den. 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); Buchanan v. Associated Press, 398 F.Supp. 1196 (D.D.C. 1975); Carey v. Hume, 390 F.Supp. 1026 (D.D.C.1975); Meeropol v. Nizer, 381 F. Supp. 29 (S.D.N.Y.1974); Cardillo v. Doubleday and Company, Inc., 366 F.Supp. 92 (S.D. N.Y.1973); Kent v. Pittsburgh Press Company, 349 F.Supp. 622 (W.D.Pa.1972); Hensley v. Life Magazine, Time, Inc., 336 F.Supp. 50 (N.D.Cal.1971); Cervantes v. Time, Inc., 330 F.Supp. 936 (E.D.Mo.1971), aff'd, 464 F.2d 986 (8th Cir. 1972), cert. den.

409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (8th Cir. 1973); Alexander v. Lancaster, 330 F.Supp. 341 (W.D.La.1971); Konigsberg v. Time, Inc., 312 F.Supp. 848 (S.D.N.Y.1970); Cerrito v. Time, Inc., 302 F.Supp. 1071 (N.D. Cal.1969); Bon Air Hotel v. Time, Inc., 295 F.Supp. 704 (S.D.Ga.1969), aff'd 426 F.2d 858 (5th Cir. 1970); Hurley v. Northwest Publications, Inc., 273 F.Supp. 967 (D.Minn. 1967), aff'd on opinion below, 398 F.2d 346 (8th Cir. 1968); News-Journal Company v. Gallagher, Del., 233 A.2d 166 (1967); Snead v. Forbes, Inc., 2 Ill.App.3d 22, 275 N.E.2d 746 (1971); Arber v. Stahlin, 10 Mich.App. 181, 159 N.W.2d 154 (1968); Beatty v. Republican Herald Publishing Company, 291 Minn. 34, 189 N.W.2d 182 (1971); Beatty v. Ellings, 285 Minn. 293, 173 N.W.2d 12 (1969), cert. den. 398 U.S. 904, 90 S.Ct. 1694, 26 L.Ed.2d 63 (1970), reh. den. 399 U.S. 917, 90 S.Ct. 2196, 26 L.Ed.2d 576 (1970); Twenty-Five East 40th Street Restaurant Corporation v. Forbes, 30 N.Y.2d 595, 331 N.Y.S.2d 29, 282 N.E.2d 118 (1972); Foster v. Laredo Newspapers, Inc., Tex.Civ.App., 530 S.W.2d 611 (1975); Demman v. Star Broadcasting Co., 28 Utah 2d 50, 497 P.2d 1378 (1972); Exner v. American Medical Association, 12 Wash.App. 215, 529 P.2d 863 (1974).

fect that whether failure to utilize an electronic delay system constitutes reckless disregard must be tried as a question of fact, would impose an obligation upon radio broadcasting companies which would inhibit, in a substantial way, the free and robust nature of the public debate. The impact of the censorship would not fall upon the broadcaster's words and ideas; instead, it would be applied to the opinions and ideas of those members of the public who elected to participate in this kind of public forum. The application of any technique of censorship to such a public forum can only result in the ultimate extinction of that forum. This consequence would follow as inevitably from a judicial rule requiring self-censorship as it would have from an administrative requirement of self-censorship which the Federal Communications Commission considered, but concluded not to adopt.[8]

Certainly no one can defend the utter moral cowardice manifested by the anonymous caller in this instance. Our decision to adopt a rule designed to safeguard the right of free speech is not intended in any way to justify such an abuse of that right. . We concede that the abuse of free speech could, in fact, be inhibited by holding that failure to use an electronic delay system may, as a question of fact, be found to constitute reckless disregard. The ultimate price, however, is the right of free speech itself, and that price is too high. We hold, therefore, that as the concept of reckless disregard is announced in *New York Times Co. v. Sullivan,* supra, it

does not include the failure to use an electronic delay system in connection with an open microphone talk show on which a public figure is defamed.

The judgment of the trial court is affirmed.

8. We note that the Federal Communications Commission, according to the record in front of us, considered a requirement for the utilization of such electronic delay equipment in connection with radio talk shows. In its Report and Order in Docket No. 18928 before the Federal Communications Commission, which was released in August of 1971, 39 F.C.C.2d 1038 (1971), the Federal Communications Commission administratively refused to adopt such a requirement. It recognized the value of such programs and their potential for rendering a significant public service by providing a forum for the expression of views. The Federal Communications Commission noted:

"It is also argued that the successful open-mike is not necessarily one that is closely controlled since the end to be attained is not just thoughtful, articulate discussion, but .the 'widest possible dissemination of information from diverse and antagonistic sources' which may well entail heated argument, robust debate, satire and even ridicule and vilifications."